**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **L.M., BY AND THROUGH HER** | : | **CIVIL ACTION** |
| **PARENTS, M.M. AND R.M., AND** | : | |
| **M.M. AND R.M. INDIVIDUALLY,** | : | |
|     **Plaintiffs,** | : | |
| | : | |
|     **v.** | : | |
| | : | |
| **DOWNINGTOWN AREA SCHOOL** | : | |
| **DISTRICT,** | : | |
|     **Defendant.** | : | **NO. 12-CV-5547** |

## MEMORANDUM OPINION

**LINDA K. CARACAPPA**                                    **April 15, 2015**
**UNITED STATES MAGISTRATE JUDGE**

Presently before this court are Plaintiffs' Motion for Judgment on the Administrative Record (Document No. 11), Defendant's Motion for Disposition on the Administrative Record and Summary Judgment (Document No. 12), and Defendant's Response in Opposition to Plaintiffs' Motion for Judgment on the Administrative Record (Document No. 13). After carefully considering the parties' arguments and reviewing the administrative record and applicable law, and for the reasons that follow, this court grants defendant's motion and denies plaintiffs' motion.

## I.      BACKGROUND

This special education tuition reimbursement action was commenced by M.M. and R.M. on behalf of their daughter, L.M. ("plaintiffs") against the Downingtown Area School District ("defendant" or "the District"). L.M. attended Shamona Creek Elementary School ("Shamona Creek") in the District from Kindergarten through fourth grade. Compl. ¶ 1. After her fourth grade year, which was 2004-2005, L.M. left Shamona Creek and began taking classes

1

at The Woodlynde School ("Woodlynde") for the 2005-2006 school year.  See Pls.' Compl., Ex. A, Hearing Officer Decision and Findings of Fact ("HOD/FF") at 37; Pls.' Brief 12/15/14 at 4. Defendant funded L.M.'s placement at Woodlynde from 2005 through the summer of 2011 pursuant to settlement agreements.  See HOD/FF at 39.  In May 2011, during L.M.'s eighth grade year, the District proposed a public school placement for 2011-2012, L.M.'s ninth grade year.  Id. at 37.  Plaintiffs rejected the placement offered by the District and enrolled L.M. at Woodlynde for 2011-2012.  Id. at 37, 46.  Plaintiffs requested a due process hearing in 2011 seeking reimbursement for both L.M.'s tuition at Woodlynde and an independent educational evaluation ("IEE") plaintiffs' obtained at their own expense.  Id. at 37.  The administrative hearing officer denied said requests, and plaintiffs appealed that decision to this court. Thereafter, the parties consented to jurisdiction before the undersigned.  This court has jurisdiction to review the decision of the hearing officer pursuant to 20 U.S.C. § 1415(i)(2) and 28 U.S.C. §§ 636(c), 1331.

Plaintiffs allege defendant failed to offer L.M. a free, appropriate public education ("FAPE") in violation of the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 et seq.; Section 504 of the Rehabilitation Act of 1973 ("Section 504"), 29 U.S.C. § 794 et seq.; and Title II of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12131 et seq.  Compl. ¶ 1.  Plaintiffs ask this court to review and reverse the decision of the Due Process Hearing Officer Linda M. Valentini, Psy. D. ("Hearing Officer") , and, as such, order defendant to reimburse plaintiffs for (i) the costs of a private school placement for the 2011-2012 school year to the present – and until such time as defendant develops and implements an appropriate program and placement for L.M. – and (ii) an IEE plaintiffs obtained at their own expense.  Id. at

¶ 5.  Plaintiffs additionally ask this court to award compensatory damages, as well as reasonable attorney's fees and costs under IDEA, Section 504, and the ADA.  Id.

II.     LEGAL FRAMEWORK

In order to receive federal education funding under IDEA, states must provide children with disabilities with a FAPE.  20 U.S.C. §§ 1401(3)(A), 1412(a)(1).  A FAPE is defined as "special education and related services" that:

> (A) have been provided at public expense, under public supervision and direction, and without charge;
>
> (B) meet the standards of the State educational agency;
>
> (C) include an appropriate preschool, elementary school, or secondary school education in the State involved; and
>
> (D) are provided in conformity with the individualized education program required under section 1414(d) of this title.

20 U.S.C. § 1401(9).  An individualized education program ("IEP"), as defined in section 1414(d), is the primary mechanism for delivering a FAPE.  An IEP is a written statement that tailors educational services to meet the specific needs of a child with a disability, and it includes, but is not limited to, statements regarding a child's present levels of academic achievement, measurable annual goals, related services and supplementary aids to be provided to a child, and any individual appropriate accommodations necessary to measure academic achievement and functional performance.  20 U.S.C. § 1414(d).

Aside from these statutory definitions and requirements, IDEA has left the task of interpreting what constitutes a FAPE to the courts.  See Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cnty. v. Rowley, 458 U.S. 176, 203 (1982).  As such, the Supreme Court has held a state offers a FAPE "by providing personalized instruction with sufficient support

3

services to permit the child to benefit educationally from that instruction." Id.  Moreover, the

Third Circuit Court of Appeals has defined a FAPE to require an education "that would confer

meaningful benefit" upon the child.  Polk v. Cent. Susquehanna Intermediate Unit 16, 853 F.2d

171, 184 (3d Cir. 1988).  See also Shore Reg'l High Sch. Bd. of Educ. v. P.S. ex rel. P.S., 381

F.3d 194, 198 (3d Cir. 2004) ("The IEP must be reasonably calculated to enable the child to

receive meaningful educational benefits in light of the student's intellectual potential.") (internal

citations omitted).  IDEA does not, however, require a school district to provide the best possible

education to the child or create an ideal IEP.  Rowley, 458 U.S. at 197 n. 21 ("Whatever

Congress meant by an 'appropriate' education, it is clear that it did not mean a potential-

maximizing education.").

III.    THE ADMINISTRATIVE RECORD

At all times relevant herein, plaintiffs have resided within the District, and L.M.

has been identified as eligible for special education under IDEA and as a protected handicapped

student under Section 504.  See HOD/FF at 37, 38.  L.M. was born on November 19, 1994, and

at the time of the Due Process Hearings in 2012, L.M. was seventeen (17) years old and in the

ninth grade.  Id. at 36, 38; N.T. 13.

In order to consider whether the placement and IEP offered to L.M. by defendant

for the 2011-2012 school year was appropriate, we must consider the evidence within the

administrative record, including the Hearing Officer's Findings of Fact and the IEP itself.  As

such, it is necessary to set forth such evidence in some detail.

A.  Hearing Officer's Findings of Fact

As referenced supra, plaintiffs made a request for a special education due process

hearing in 2011 to address their complaint that defendant failed to offer L.M. a FAPE.  Due

4

process hearings were held on January 30, 2012, March 13, 2012, June 4, 2012, and June 5, 2012, and the Hearing Officer heard testimony from eleven (11) witnesses.  See HOD/FF at 36. R.M., L.M.'s mother, and Georgia Solely, a school psychologist at the District who completed L.M.'s reevaluation, testified on the first day of the hearing.  Dr. AnneMarie Brescia, a pediatric rheumatologist at DuPont Hospital for Children, Jill Dougherty, head of the upper school at Woodlynde, Donna Trigone, the school nurse at Woodlynde, and JoAnn Hibbs, a school psychologist at Council Rock School District who completed the IEE, testified on the second day of the hearing.  Lauren Kertis, a learning support teacher at the District high school, Jeannine Rhatican, a reading specialist at the District high school, Ryan Farrell, the Assistant Principal of Downingtown High School West campus, and Christopher Fulco, head of school at Woodlynde, testified on the third day of the hearing.  Andrew Hoffert, supervisor of Special Education for the District high school programs, testified on the fourth day of the hearing.

The Hearing Officer found, in a decision dated July 3, 2012, that at eight (8) months of age, L.M. was diagnosed with Juvenile Idiopathic Arthritis ("JIA"), also referenced in the record as Juvenile Rheumatoid Arthritis, which included symptoms such as rashes, joint pain, and morning stiffness.[1]  See id.  At eleven (11) months of age, L.M. was diagnosed with chronic static encephalopathy, or a brain injury, secondary to oxygen deprivation as a result of seizures. Id.  L.M. has also been diagnosed with asthma and allergies, which require shots; side effects from the shots include welts on the arms and fatigue.  See id. at 38-39.  L.M. has permanent residual damage in the ankles, fingers, and wrists.  See id.  The Hearing Officer noted L.M.'s medical conditions and/or side effects from medications she has been prescribed have, at various

---

[1] Although the Hearing Officer found L.M. had Juvenile Rheumatoid Arthritis, plaintiffs' state in their brief L.M. had Systemic Juvenile Rheumatoid Arthritis, a rare subset of Juvenile Rheumatoid Arthritis.  See Pls.' Brief 12/15/14 at 3.

times, resulted in a compromised immune system, macrophage activation syndrome ("MAS"), acid reflux, spiked fevers, and compromised bone strength. See id. at 38. L.M.'s conditions and medications change at various times, so side effects from medication are "present at some times and not at others." Id. at 39. For instance, at the first due process hearing on January 30, 2012, L.M. was not having spiked fevers, and her joint pain, skin rash, and fevers were absent as a result of being properly medicated. Id. L.M. was, however, having joint pain in the knee and had been wearing a knee brace for about one and a half years (1 ½) to two (2) years. Id. Prior to the start of the first due process hearing, L.M. had been arthritis symptom-free for one (1) year and had been weaning off her arthritis medication. After a symptom flare up, however, L.M. went back on arthritis medication as of the first due process hearing. Id.

Defendant funded L.M.'s placement at Woodlynde from 2005 through the summer of 2011 pursuant to settlement agreements. The original settlement agreement in 2005 covered two (2) school years, and it was extended twice – in 2007 and 2009 – before expiring in the summer of 2011. Id. at 40. On January 7, 2011, prior to the expiration of the extended settlement agreement, and prior to the start of the 2011-2012 school year, defendant provided plaintiffs with a Permission to Evaluate form to "make an offer of FAPE going forward." Id. Defendant's intention was "to try and bring [L.M.] back into the District." Id. at 41. Plaintiffs signed and returned the Permission to Evaluate form on January 12, 2011. Id. at 40. In a January 12, 2011 email to the District, L.M.'s parents wrote L.M. was receiving FAPE at Woodlynde, acknowledged that tough economic times make it necessary for the District to evaluate expenses and make adjustments, but that it "will not be at the expense of [L.M.'s] education. Id. L.M.'s parents also noted it was their intent "to see that L.M. continues to receive FAPE." Id. The District Psychologist testified she "knew the District was looking to try to bring

6

back a lot of students since [the District] had programs available for Students." Id. The District

Psychologist testified she was told in "not so many words," but received the understanding from

a special education director at the District, that the District was going to try to bring L.M. back to

the District high school. Id.

As part of the reevaluation process, defendant's District Psychologist reviewed

L.M.'s educational file at the District, contacted L.M.'s parents to obtain current information

about L.M.'s medical needs and medications, along with L.M.'s needs and strengths at home,

and provided the following subjective inventories: the Behavior Assessment System for

Children, Second Education ("BASC-II"); the Behavior Rating Inventory of Executive

Functioning ("BRIEF"); and the Adaptive Behavior Assessment System, Second Edition

("ABAS-II"). Id. The subjective inventories were then scored and interpreted. Id. In addition,

the District Psychologist spoke to two (2) staff members from Woodlynde, reviewed

accommodations and specially designed instruction provided to L.M. at Woodlynde, sought

input from teachers at Woodlynde by, for instance, providing and reviewing teacher response

forms, reviewed L.M.'s class schedule and attendance records from 2010-2011, reviewed daily

and quarterly progress reports from Woodlynde, and reviewed L.M.'s G-MADE and STAR

reading scores. Id. Moreover, the District Psychologist interviewed L.M. regarding post-

secondary goals and obtained input from L.M.'s parents regarding post-secondary goals. Id. She

observed L.M. at Woodlynde in order to assess, among other things, whether L.M. had trouble

focusing, and what accommodations, if any, were in place for L.M.'s physical limitations. Id. at

42. The District Psychologist also conducted two (2) days of testing with L.M. and observed that

L.M. did not exhibit fatigue or other manifestations of physical discomfort, and when breaks in

testing were offered, L.M. indicated breaks were not needed. Id. The District Psychologist

received input from Woodlynde's school nurses, and the nurses opined L.M. did not need more than the allotted three (3) minutes in between classes at Woodlynde to travel to her classes and she walked at a normal pace.  Id.

In response to the District Psychologist's request for information, L.M.'s parents sent a list of thirty-two (32) "learning accommodations" that had been drafted by the director of the middle school at Woodlynde.  Id.  The accommodations included: repeated directions by teacher and repeated/paraphrased directions by student; visual and auditory prompts; extended response time and extended time for tests and assignment completion; foreign language exemption; preferential seating; multimodal learning opportunities; computer and calculator use; graphic organizers; use of recorded materials; use of electronic software for reading and writing; alternative assessment; small group instruction; chunking of assignments; a reader for test taking as required; and a quiet room for tests/quizzes.  Id. at 41-42.

In preparing the reevaluation, the District Psychologist also reviewed L.M.'s testing regarding different subject areas.  On the Wechsler Intelligence Scale for Children – Fourth Edition ("WISC-IV"), L.M.'s verbal comprehension scores were at the bottom of the borderline range, her processing speed was at the top of the extremely low range, and her perceptual reasoning and working memory scores were within the average range.  Id. at 42. Working memory was in the average range and was listed as a strength in the reevaluation, however L.M.'s mother testified regarding L.M.'s difficulties with memory, and L.M.'s teachers also referenced memory issues.  Id.  The District Psychologist agreed that by third party reports, L.M. had deficits in both long and short term memory.  Id.  The District Psychologist also reviewed L.M.'s scores on the Wechsler Individual Achievement Test – Third Edition ("WIAT-III"), which revealed a significant discrepancy between cognitive ability and achievement in

basic reading, reading comprehension, reading fluency, math fluency, math problem solving, and listening comprehension.  Id.  L.M.'s independent reading comprehension was at a third grade level, and she scored within the broad average range in written expression.  Id. at 42-43.  On the BASC-II parent scales, leadership, functional communication, and resiliency were in the at-risk range.  Id. at 43.  All of L.M.'s other scores on the parent and teacher scales and on L.M.'s self-report were in the average range.  Id.  On the ABAS-II teacher scales, L.M.'s scores in communication skills, functional academics, leisure, and self-care were observed as areas of significant weakness.  Id.

Upon review of the above-referenced materials, the District's Reevaluation Report ("RR") was completed on February 15, 2011 and was emailed to L.M.'s parents on February 25, 2011.  Id.  The RR identified L.M.'s primary disability classification as Other Health Impairment ("OHI") due to chronic static encephalopathy and other complex medical conditions.  Id.  The secondary disability classification was identified as Specific Learning Disability ("SLD") in the areas of basic reading skills, reading comprehension, reading fluency, math problem solving, and listening comprehension.  Id.  L.M.'s mother testified that upon review of the report, she had concerns about the medical piece of the RR but not about the educational piece.  Id.  The Hearing Officer noted L.M.'s mother emailed the District Psychologist after receiving the RR on February 25, 2011 and asked, "Can you clarify . . . for [L.M.] to continue to accept Woodlynde as FAPE I will need to schedule a due process hearing?"  Id.  On February 28, 2011, the District's Director of Special Education responded to L.M.'s mother's inquiry and explained the process.  The Director of Special Education explained that after plaintiffs' had a chance to review the RR, the special education teacher assigned to develop a draft IEP would schedule an IEP team meeting to review the report and discuss program

options.  Id.  After an IEP team meeting, the team would construct an IEP they felt would meet L.M.'s academic and transitional needs.  Id.  The Director of Special Education explained the finalized IEP would constitute the District's offer of FAPE, and upon completion of a finalized IEP, plaintiffs would be issued a Notice of Recommended Educational Placement ("NOREP").  Id.  Plaintiffs could then indicate whether they approved of the plan, and if they did not, they could request an informal meeting, mediation, or a due process hearing.  Id. at 43-44.  L.M.'s mother responded to said email on February 28, 2011 stating ". . . it is my intention that [L.M.] continues to receive FAPE thru the Woodlynde School.  Please except (sic) this as my written authorization for Due Process."  Id. at 44.

On April 9, 2011, the District developed a draft IEP in advance of the IEP team meeting and sent it to plaintiffs on April 11, 2011, so plaintiffs could review and revise the draft prior to the meeting.  Id. at 45.  The District also prepared a draft sample class schedule for L.M. for grades nine (9) through twelve (12) for graduation planning purposes and sent it to plaintiffs in advance of the meeting.  L.M.'s proposed courses for the 2011-2012 school year included: (i) Reading Foundations – a regular education class (where the majority of students in said class were special education), which had up to fifteen (15) students and one (1) teacher; (ii) English II – a regular education class with up to twenty (20) students and one (1) teacher; (iii) Algebra IA – a regular education class with up to twenty (20) students and one (1) special education teacher along with one (1) support staff in one section; (iv) Math Plus Lab – a special education class with up to five (5) students and one (1) teacher; (v) Earth Space and Science – a regular education class with over twenty six (26) students, or alternatively, Earth and Space Science Assist, a smaller supported class; (vi) Freshman Orientation – a special education class with up to fifteen (15) students and one (1) special education teacher; (vii) Wellness/Fitness – a regular

10

education class with up to thirty (30) students; and (viii) Structured Study Hall – a special education class with between five (5) and fifteen (15) students with one (1) teacher and one (1) support staff.  Id. at 44.  Finally, the District proposed placing L.M. in Read 180®, a reading program designed for students in grades 3-12 whose reading achievements are below the proficient level.  See id. at 45.  Read 180® could be delivered to L.M. in a daily 90-minute block in a group of (15) students.  Id.

The IEP team meeting was held on May 4, 2011.  Id.  L.M. and her mother attended the meeting, and L.M.'s mother participated in discussions about which grade level L.M. would be assigned to and which gym class L.M. would take.  Id.  The Hearing Officer found that at the IEP meeting, neither L.M. nor her mother raised a concern regarding L.M. having to walk too far at the high school or L.M.'s psychical condition, except in the context of which gym class L.M. would take.  Id.  The Assistant Principal at the District testified if the IEP team had met again, they would have considered additional class options for L.M.  Id. at 44.  At L.M.'s request, L.M. spent a full day at the District's high school approximately three (3) days after the IEP meeting, shadowing another student, in order to see what a typical school day would be like.  Id. at 45.  The Hearing Officer found L.M. raised no concerns regarding her visit, and no one reported seeing L.M. having any trouble navigating the building.  Id.  The only item raised by plaintiffs at the time, the Hearing Officer noted, was a remark from L.M.'s father when he picked L.M. up at the end of her visit that the District high school was larger and had more pupils than Woodlynde.  Id. at 45-46.

The IEP was finalized and the District issued a NOREP to plaintiffs dated May 4, 2011.  Id. at 46.  On May 13, 2011, plaintiffs indicated they did not approve of the recommendation.  Id.  The parents stated they believed Woodlynde to be the least restrictive

appropriate environment for L.M. due to its multisensory approach and its classroom size of eight (8) to twelve (12) students with two (2) learning support teachers.  Id.  The Hearing Officer noted that in rejecting the NOREP, plaintiffs did not make any reference to the two (2) principal concerns plaintiffs raised throughout the due process hearing: L.M.'s medical issues and perceived problems with the proposed IEP.  Id.

On May 17, 2011, the District sent a letter to plaintiffs denying plaintiffs' request for tuition reimbursement for Woodlynde for the 2011-2012 school year.  Id.  By email dated May 19, 2011, plaintiffs indicated their intent to re-enroll L.M. at Woodlynde for 2011-2012 and again requested that the District fund L.M.'s placement.  Id.  On June 20, Woodlynde sent the District a tuition bill for the 2011-2012 school year, and the District informed Woodlynde it would not be funding plaintiffs' unilateral placement.  Id.

About two (2) months after receiving the District's RR, in April 2011, plaintiffs procured a neuropsychological evaluation from the Children's Hospital of Pennsylvania ("CHOP"), wherein a hospital evaluator, who was a licensed psychologist, but not a certified school psychologist, agreed with the District's classification of L.M.'s primary disability category as OHI due to static encephalopathy, but did not disclose a learning disability in any area, because the psychologist used a testing system that did not permit for comparison with academic achievement.  Id.  The psychologist's evaluation was performed on April 27, 2011, and was sent to plaintiffs on June 26, 2011.  The psychologist's evaluation noted ordinary activities such as walking through hallways in a large school building can be stressful for a person with JIA.  Id.  She also noted that due to "lags in social maturity," L.M. lacked the emotional resources to cope effectively with the social demands of a school setting where most students are at a higher level of maturity.  Id. at 46-47.  In addition, however, the psychologist opined L.M. is

12

seen by Woodlynde teachers as "well able to meet demands of everyday situations age-appropriately" as evidenced by L.M.'s BASC-II scores, and noted L.M. "did not appear to be affected by [a facial rash]" (in the sense of being self-conscious), was physically capable of remaining invested in her performance throughout a five (5) hour test session, denied pain, and walked unassisted with a "grossly normal gait." Id. at 47. The psychologist made the following recommendations for addressing L.M.'s medical needs at school: determine a plan for homebound instruction should absenteeism for illness be expected to last for a period of two (2) weeks; provide counseling assistance with regard to how L.M. should inform peers and others when a facial rash may invoke concern; provide psychosocial counseling around the issue of assertive communication at school regarding medical and other needs; and provide a gym program that is coordinated with L.M.'s outpatient Physical Therapy program, with regard to addressing related goals. Id.

On October 21, 2011, plaintiffs received an IEE from a certified school psychologist, which included a record review, testing of L.M., observations of L.M. during a summer program at Woodlynde, and an opinion on the appropriateness of defendant's proposed IEP for the 2011-2012 school year. Id. The independent evaluator noted L.M. had a remarkable focus and attention span over three (3) sessions of testing, worked diligently and appeared highly motivated, and denied needing breaks on multiple occasions. Id. The independent evaluator did not note any difficulties regarding L.M.'s social or emotional behavior; however, she disagreed with the District and CHOP evaluators that OHI should be L.M.'s primary disability category, and instead opined SLD should be the primary disability category, while OHI should be a secondary category. Id. The independent evaluator opined L.M.'s IEP should include written expression goals, interventions to assess L.M.'s memory and process speed deficits, and a

13

transition plan to address emotional needs arising from switching schools.  Id. at 48.  The evaluator stated L.M. must need what Woodlynde is providing, because L.M. is making progress at Woodlynde.  Id.  The independent evaluator submitted a supplemental report subsequent to plaintiffs' formal request for a due process hearing after observing thirty-two (32) minutes of the Read 180® program and one (1) English period at the District high school.  Id.

On November 22, 2011, L.M.'s rheumatologist submitted a letter opining L.M. needs a smaller educational setting to minimize exposure to infections and decrease stress on joints from walking long distances.  Id.  The letter further stated L.M. should avoid steps, running, excessive walking, and prolonged sitting.  Id.  The rheumatologist recommended L.M. receive two (2) sets of books, use of an elevator, a laptop for writing assignments, no timed tests, no grades for handwriting, and extended time between classes.  Id.

The Hearing Officer noted Woodlynde is an old elementary school building, and in ninth grade, L.M. walked 1227 to 1378 feet on a given day.  Id.  The longest distance between classes, which is 242 feet, is the walk from the last class of the day to the bus.  There is no elevator at Woodlynde, and L.M. ascended or descended stairs at least six (6) times per day.  Id. Moreover, L.M. was required to go outside each day to access a mobile classroom.  Id.

The Hearing Officer stated the District high school for ninth grade is a two-story building, and pursuant to the District's proposed class schedule, L.M. would travel approximately 2035 feet per day, not including returning to the main entrance of the building to return home.  Id. at 49.  The District high school has an elevator, and L.M. would have the option of either climbing the stairs or using the elevator.  Id.

In addition to the factual findings described above, the Hearing Officer made findings of credibility regarding the witnesses who testified at the hearings.  The Hearing Officer

14

found that although all witnesses seemed to be testifying honestly, some witnesses' testimony was deemed less reliable.  Id. at 50.  With regard to plaintiffs' witnesses, the Hearing Officer noted although the head of the upper school at Woodlynde testified in detail about L.M.'s schedule and the physical layout of the school, it was only on cross examination that the head of the upper school admitted L.M. had to ascend and descend stairs about five (5) times per day and travel outdoors to a mobile classroom.  Id.  The Hearing Officer further found the independent evaluator, who performed plaintiffs' IEE, went beyond the bounds of her data set and the data she had available to her from the two (2) psychologists whose reports predated hers in an attempt to establish (i) L.M. had a specific learning disability in written expression, and as a result, the IEP was inadequate for failing to address this area in a goal, and (ii) SLD, and not OHI, was L.M.'s primary disability category.  Id.  The Hearing Officer found these efforts by the independent evaluator obscured the issues.  Id.  With regard to the District's witnesses, the Hearing Officer noted the District Psychologist who drafted the IEP did not present as secure in her professional knowledge and did not do well on cross-examination, possibly due to a lack of confidence and experience.  Id.  The Hearing Officer noted the District's reading teacher explained the Read 180® program in a lucid and engaging manner that established the District was offering an excellent reading program with a good likelihood of success in helping L.M. to make meaningful progress in literacy.  Id.

B.  The Hearing Officer's Decision

In a decision dated July 3, 2012, the Hearing Officer found: (i) plaintiffs were not entitled to reimbursement for the 2011-2012 school year, because defendant's proposed program and placement for said year was appropriate; (ii) plaintiffs' request for IEE reimbursement was denied, because defendant produced a complete and thorough reevaluation of L.M. in all areas of

suspected exceptionality; and (iii) plaintiffs had waived their claims under Section 504, based upon a lack of evidence and argument.  See id. at 21-22.

## II.       STANDARDS OF REVIEW

If the parents of a disabled child do not agree with the IEP offered by a school district, they may request a due process hearing.  20 U.S.C. § 1415(f)(1).  Any party "aggrieved by the findings and decision" of the administrative hearing may appeal the decision to a state educational agency.  20 U.S.C. § 1415(g).  If a party disagrees with the final result of the administrative review process, they may appeal that result to federal district court.  20 U.S.C. § 1415(i)(2)(A).

"Where no new evidence has been presented to the [district court], motions for summary judgment in an IDEA case are the procedural vehicle for asking the judge to decide the case based on the administrative record."  K.H. o/b/o B.Y. v. N. Hunterdon-Voorhees Reg'l High Sch., 2006 WL 2331106, at 4 (D.N.J. Aug. 10, 2006).  "The standard of review under which [a district court] considers an appeal of a state administrative decision under the IDEA 'differs from that governing the typical review of summary judgment.'"  M.A. ex rel. G.A. v. Voorhees Tp. Bd. of Educ., 202 F.Supp.2d. 345, 359 (D.N.J. 2002) (citation omitted).  The court "applies a modified version of de novo review."  L.E. v. Ramsey Bd. of Educ., 435 F.3d 384, 389 (3d Cir. 2006).  The modified de novo standard is "unusual."  Shore Reg'l, 381 F.3d at 199.  Indeed, a district court "must make its own findings by a preponderance of the evidence, [and] must also afford 'due weight' to the ALJ's determination."  Id. (citations omitted).  "[T]he party challenging the administrative decision bears the burden of persuasion before the district court as to each claim challenged."  Ridley Sch. Dist. v. M.R., 680 F.3d 260, 270 (3d Cir. 2012).

The district court takes into account not only the record from the administrative proceeding, but also any further evidence the district court accepts into the record. Here, plaintiffs have not proffered additional evidence beyond the administrative record. Under modified de novo review, "factual findings from the administrative proceedings are to be considered prima facie correct." Shore Reg'l, 381 F.3d at 199 (citations omitted). "If a reviewing court fails to adhere to them, it is obliged to explain why." Id. (citations omitted). A district court should defer to the hearing officer's factual findings from an administrative proceeding "unless the non-testimonial, extrinsic evidence in the record would justify a contrary conclusion or unless the record read in its entirety would compel a contrary conclusion." S.H. v. State-Operated Sch. Dist. of the City of Newark, 336 F.3d 260, 270 (3d Cir. 2003) (citations omitted). Judicial review is "by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review." Rowley, 458 U.S. at 206.

In contrast, the "due weight" to be afforded to administrative proceedings is "not implicated with respect to issues of law, such as the proper interpretation of the [IDEA] and its requirements." In re Educ. Assignment of Joseph R., 318 F. App'x 113, 117-18 (3d Cir. 2009) (citations omitted). As such, an ALJ's legal determinations are reviewed de novo. Id.

III.    DISCUSSION

The issues before this court are (i) whether the Hearing Officer erred as a matter of law in denying plaintiffs' request for tuition reimbursement, and (ii) whether the Hearing Officer erred in denying plaintiffs' request for reimbursement for an IEE. In addition, plaintiffs request this court find defendant's actions in violation of both Section 504 and the ADA,

however, plaintiffs have provided no argument in their motion in support of said requests.

Plaintiffs also request compensatory damages, attorneys' fees, and costs.

   a.   Whether the Hearing Officer Erred as a Matter of Law in Denying Plaintiffs' Request for Tuition Reimbursement

           IDEA empowers a court "to order school authorities to reimburse parents for their expenditures on private special education for a child if the court ultimately determines that such placement, rather than a proposed IEP, is proper under the Act." Sch. Comm. of the Town of Burlington v. Dep't of Educ., 471 U.S. 359, 369 (1985). Courts apply a three-step analysis to determine whether tuition reimbursement is appropriate, known as the Burlington-Carter test. Under the test, the party seeking relief must show: (i) the public school did not provide a FAPE; (ii) placement in a private school was proper; and (iii) the equities weigh in favor of reimbursement. See Florence Cnty. Sch. Dist. v. Carter ex rel. Carter, 510 U.S. 7, 12-16 (1993); Burlington, 471 U.S. at 369-70, 373-74. IDEA sets forth procedural and substantive obligations that a school district must fulfill to provide a FAPE to disabled students. 20 U.S.C. §§ 1401(9), 1412(a)(1).

           In support of their argument that the Hearing Officer erred as a matter of law in denying plaintiffs' request for tuition reimbursement, plaintiffs allege the Hearing Officer incorrectly concluded (i) the reevaluation of L.M. was appropriate and was not predetermined, (ii) the IEP offered by the District was appropriate, and (iii) L.M.'s parents acted unreasonably in their failure to consider the District's offer. We will address each argument in turn.[2]

   i.   Adequacy of IEP

---

[2] For ease of discussion, we will first evaluate the appropriateness of the District's IEP under the Burlington-Carter test before turning to plaintiffs' argument regarding whether the RR was appropriate.

Plaintiffs allege the preponderance of the evidence presented at the Due Processing Hearings established the IEP dated May 4, 2011 was not reasonably calculated to enable L.M. to receive meaningful educational benefit nor was it likely to confer significant learning to L.M.  See Pls.' Brief 12/15/14 at 21.  Plaintiffs state the IEP was based on an inappropriate reevaluation, failed to fully address all of L.M.'s needs, and was predetermined in violation of the law, resulting in a denial of FAPE.  See id.  Plaintiffs further argue the District's IEP did not meet the standard of appropriateness, because: (i) the Hearing Officer evaluated the IEP based upon an inappropriate "minimum baseline standard" and incorrectly found the IEP met that minimum baseline standard; (ii) the District predetermined L.M.'s placement and denied plaintiffs the right to meaningfully participate in the IEP process; (iii) the IEP was based solely on one (1) page of the RR – which was inappropriate – and as such, it follows the IEP was inappropriate; (iv) the IEP contained a boilerplate transition plan that failed to include a discussion about whether L.M. required anything other than said boilerplate plan; (v) several of the goals and expected levels of achievement included in the IEP were inappropriate; (vi) the classes proposed for L.M. were not conducive to her learning, because they were generally too large and did not have sufficient opportunity for one-on-one instruction or guided instruction; and (vii) the size of the District high school and number of students were too much for L.M. and her medical conditions.  Id. at 28-33.  Conversely, defendant argues the Hearing Officer correctly determined the District's IEP was appropriate at the time it was developed pursuant to the first prong of the Burlington-Carter test.  Def.'s Mot. for Summ. J. at 27.  Defendant states the IEP included post-secondary transition services and goals, numerous accommodations, specially designed instructions, and small classes with low student-to-teacher ratios.  Id. at 27-28.  Defendant asserts the Hearing Officer properly concluded, after reviewing testimony and

19

documentary evidence, the District was going to "try" to bring L.M. back to the District, which is legally required by IDEA's least restrictive environment ("LRE") mandate and does not constitute predetermination. Id. at 22. Finally, defendant states the "minimum baseline standard" is the correct legal standard under which the IEP should have been analyzed, and as such, plaintiffs' allegations are without merit. Def.'s Resp. 1/30/15 at 7. For the reasons that follow, we find the IEP was evaluated under the proper standard, was not predetermined, and was reasonably calculated to enable L.M. to receive educational benefits, and, as such, provided L.M. with a FAPE.

As referenced supra, under the first prong of the Burlington-Carter test, an IEP must be "reasonably calculated to enable the child to receive educational benefits." Rowley, 458 U.S. at 206-07. An IEP must result in more than de minimus benefits and must ensure the child is educated in the least restrictive environment. See Oberti v. Bd. of Educ. of Borough of Clementon Sch. Dist., 995 F.2d 1204, 1209 n. 6 (3d Cir. 1993); M.C., 81 F.3d at 393. "Although the IEP must provide the student with a 'basic floor of opportunity,' it does not have to provide 'the optimal level of services,' or incorporate every program requested by the child's parents." Ridley, 680 F.3d at 269 (internal citations omitted); see also Rowley, 458 U.S. 176, 192 (1982) (noting Congressional purpose of IDEA was to "open the door of public education to handicapped children on appropriate terms" more than it was intended to "guarantee any particular level of education once inside."). The FAPE promised to students in IDEA is not a perfect or ideal education. A school district need not "maximize the potential of every handicapped child, [but] must supply an education that provides 'significant learning' and 'meaningful benefit' to the child." Ridley, 680 F.3d at 269 (internal citations omitted). While an IEP must be developed in consideration of a student's potential and with an eye to long-term

20

goals, the adequacy of an IEP can only be determined "as of the time it is offered to the student, and not at some later date." Fuhrmann v. East Hanover Bd. of Educ., 993 F.2d 1031, 1040 (3d Cir. 1993). "The issue of whether an IEP is appropriate is a question of fact." D.S. v. Bayonne Bd. of Educ., 602 F.3d 553, 564 (3d Cir. 2010) (internal citations omitted).

A.  Minimum Baseline Standard

Plaintiffs argue the District's IEP is inappropriate, because the Hearing Officer evaluated the IEP in light of an inappropriate "minimum baseline standard" and incorrectly found the IEP met said minimum baseline standard. Pls.' Mot. for Judgment at 28. Plaintiffs state the Hearing Officer's opinion noted the District offered a "Buick, albeit one that needed a minor tune-up," and found concerns raised by plaintiff were not fatal to the IEP, because the IEP met the basic "floor of opportunity," which, plaintiffs argue, is not the appropriate standard under IDEA. Id. at 28, 29. Plaintiffs argue a proper IEP does not need a "tune up." Id. at 28. In response, defendant states the "minimum baseline standard" is the correct legal standard under which the District's IEP should have been analyzed, and as such, plaintiffs' allegations are without merit.

For the reasons that follow, we find the Hearing Officer evaluated the IEP under the proper legal standards. In her decision, the Hearing Officer noted Sinan L, et al. v. School District of Philadelphia, 2007 WL 1933021 (E.D. Pa. 2007), described the standard for evaluating an IEP as a "minimum baseline standard." HOD/FF at 55. The Hearing Officer further noted, in relevant part:

> School districts . . . provide FAPE by designing and implementing a program of individualized instruction set forth in an [IEP]. The IEP must be "reasonably calculated" to enable the child to receive "meaningful educational benefit . . . ."

> An eligible student is denied FAPE if the IEP is not likely to produce progress, or if the program affords the child only a "trivial" or "<u>de minimus</u>" educational benefit.
>
> The Third Circuit explains that while an "appropriate" education must "provide 'significant learning' and confer 'meaningful benefit,'" it "need not maximize the potential of a disabled student." An IEP must provide a "basic floor of opportunity."

<u>Id.</u> at 51 (citations omitted). With that standard in mind, the Hearing Officer found "the IEP provided [L.M.] with the basic 'floor of opportunity' articulated by our 3rd Circuit Court . . ." <u>Id.</u> at 54. The Hearing Officer noted, "[a]lthough [plaintiffs] raised concerns about the IEP itself at the [due process] hearing . . . these were not fatal to the IEP . . . . I find the District's offer for 2011-2012 more than met the standard of appropriateness." <u>Id.</u> at 54-55.

In light of the above, we find the standard under which the Hearing Officer analyzed the IEP to be the proper standard. Moreover, despite plaintiffs allegations, the Hearing Officer's statement that the IEP needed a "minor tune up" is not fatal to the IEP. <u>See, e.g.</u>, <u>Sinan L.</u>, 2007 WL 1933021 at 8 (noting although Hearing Officer acknowledged "minor errors" in IEP with regard to measurable annual goals, IEP was "sufficiently responsive to [plaintiff's] overall needs"). As such, we find no merit to plaintiffs' allegations that the Hearing Officer analyzed the IEP under an improper standard.

### B. <u>Predetermination</u>

Plaintiffs also argue the Hearing Officer erred in finding the District did not predetermine L.M.'s placement, because the District unilaterally decided the placement for L.M., along with the contents of the IEP and the courses L.M. would take, prior to the IEP meeting, and denied plaintiffs their right to meaningfully participate in the IEP process. Pls.' Brief 12/15/14 at 28. Defendant states plaintiffs' allegations that the IEP was predetermined are not

relevant to whether the IEP was appropriate for purposes of the first prong of the Burlington-Carter test.  Moreover, defendant argues the Hearing Officer heard all testimony of the witnesses, judged their credibility, and properly rejected plaintiffs' allegation as a matter of fact, finding the District's intention was to "try" to bring L.M. back to public school, if such would be appropriate to meet L.M.'s needs, in keeping with the District's requirement that it offer a placement in the "least restrictive environment."  Def.'s Resp. 1/30/15 at 4-5.  Defendant further argues if any predetermination was made in this matter, it was only made by plaintiffs.  Id. at 5.

Courts within our district have held "predetermination of an IEP can be grounds for finding a violation of the IDEA, in particular because predetermination can serve to exclude parents from meaningfully participating in the decision making process."  D.B. ex rel. H.B. v. Gloucester Twp. Sch. Dist., 751 F. Supp. 2d 764, 771 (D.N.J. 2010) aff'd sub nom. D.B. v. Gloucester Twp. Sch. Dist., 489 F. App'x 564 (3d Cir. 2012).  Predetermination is a procedural violation of IDEA but is not a per se violation of FAPE.  See C.H. v. Cape Henlopen School District, 606 F.3d 59, 66 (3d Cir. 2010).  A school district's failure to comply with a procedural requirement of IDEA constitutes a denial of FAPE only if such a violation caused substantive harm to the child or her parents.  See id.  Substantive harm occurs only if the preponderance of the evidence indicates the procedural inadequacies: (i) impeded the child's right to a FAPE; (ii) significantly impeded the parents' opportunity to participate in the decision-making process regarding the provision of a FAPE to the child; or (iii) caused a deprivation of educational benefits.  34 C.F.R. § 300.513(a)(2).

For the reasons that follow, we agree with the Hearing Officer's determination that the District did not predetermine L.M.'s placement at the District high school.  The Hearing Officer noted:

23

The parents believe that the District predetermined [L.M.'s] placement. Rather, the District's stated intent was to "try" to bring [L.M.] back to the District's high school, and this effort was not unreasonable given considerations of LRE coupled with fiscal responsibility in expending public funds. On the other hand, the Parents' clearly stated intent from the beginning of the reevaluation process was to keep [L.M.] at [Woodlynde.] In this regard, although the concept of "predetermination" applies only to Districts and is not a two-way street, I do find that the Parents behaved inequitably albeit in a manner that they believed with conviction was protecting their child's best interest. I find that the Parents' request for a Due Process Hearing just days after their receipt of the reevaluation report, before an IEP was created and a NOREP offered, was unreasonable. Although the Parents ultimately participated in an IEP meeting, and [L.M.] visited the high school, I find no credible evidence that the family seriously entertained the prospect of accepting the District's proposed program and placement. Special Education Appeals Opinions offer reflections that are consistent with my thoughts in this regard: "When [t]he parents have become so singularly focused on the [private school in which they have already enrolled their child] that they appear unwilling to consider the District's proposals in good faith," tuition reimbursement should be denied . . . Similarly, "Where the parents have predetermined that they will place their child in a private school regardless of the district's ability to program for the child, the equities favor the District."

HOD/FF at 54 (citations omitted).

Here, although the IEP team proposed a draft IEP and a tentative class schedule prior to the IEP team meeting, and made internal revisions to the draft IEP prior to providing it to plaintiffs, it is not a violation of IDEA "for members of the IEP team to come to preliminary conclusions prior to the IEP meeting." D.B., 751 F. Supp. 2d at 775 n. 11. In Fuhrmann on Behalf of Fuhrmann v. East Hanover Board of Education, 993 F.2d 1031 (3d Cir. 1993), the Third Circuit found there was no predetermination when a draft IEP had been circulated prior to the IEP meeting, because the parents were presented with a draft IEP at the team meeting, discussed it, and suggested changes, some of which were incorporated into the final IEP. Id. at 1036. Even though the parents in Fuhrmann did not sign the final IEP, the parents had an opportunity to participate in the drafting of the IEP in a meaningful way. Id.

24

Here, the District provided plaintiffs with a draft IEP and a proposed class schedule on April 11, 2011 prior to the IEP meeting on May 4, 2011.  See HOD/FF at 45. Although plaintiffs argue the IEP was "drafted, reviewed, revised, and finalized prior to the IEP meeting," the Hearing Officer, who heard all of the testimony and judged the credibility of the witnesses, rejected as fact that the IEP placement was predetermined, and we find no non-testimonial, extrinsic evidence in the record that the District had "finalized" the IEP and was not open to considering suggestions offered by plaintiffs.  See D.S., 602 F.3d at 564; Pls.' Brief 12/15/14 at 29.  Moreover, while the District stated in an email dated January 19, 2011 it would like to "try" to bring L.M. back to the District's high school, the Hearing Officer noted, and we agree, that such an effort is not unreasonable given the legal mandate of IDEA requiring school districts to offer a placement in the LRE appropriate for the student and to be fiscally responsible in expending public funds.  HOD/FF at 41; T.R. v. Kingwood Twp. Bd. of Educ., 205 F.3d 572, 578 (3d Cir. 2000) (LRE mandate requires district to place disabled student in least restrictive environment capable of providing student with meaningful educational benefit).  The District cannot be faulted for conferring, thinking, and developing proposed ideas and options prior to the IEP meeting as long as a meaningful IEP meeting was subsequently conducted, as here.  Indeed, in keeping with Fuhrmann, plaintiffs were given opportunities to review and comment on the draft IEP and proposed class schedule, articulate any concerns to the District prior to the finalization of the IEP, and make changes to the proposed IEP and tentative class schedule.  See Fuhrmann, 993 F.2d 1036.  The Hearing Officer found that during the IEP meeting, "neither [L.M.] nor [L.M.'s] mother raised a concern regarding [L.M.'s] physical condition, except in the context of whether [L.M.] would take one or the other gym class."  Id.  As such, and pursuant to a request from plaintiffs, the District modified L.M.'s proposed schedule such that L.M. could

take a regular education gym class.  Docket No. 7, Administrative Record, Exhibits P-17,  J-20.

When L.M. visited the District high school approximately three (3) days after the IEP team

meeting, L.M. raised no concerns regarding the visit, and no one at the high school reported

seeing L.M. having trouble navigating the building.  HOD/FF at 45-46.  The only concern raised

on the date of the visit was a comment from L.M.'s father when he picked L.M. up at the end of

the day that the District high school was larger and had more pupils than Woodlynde.  Id.  It was

not until the Due Process Hearing plaintiffs voiced concerns regarding L.M.'s memory issues

that were not directly addressed, L.M.'s transition to public school from private school, and the

measurability of post-secondary goals.  Id. at 46, 54.  As such, the District cannot be faulted for

failing to incorporate plaintiffs' alleged concerns into the IEP, when said concerns were not

communicated to the District.  Because plaintiffs were given opportunities to (i) review and

comment on the draft IEP and proposed class schedule, (ii) articulate any concerns to the District

prior to the finalization of the IEP, and (iii) make changes to the proposed IEP and tentative class

schedule, we find plaintiffs had an opportunity to participate in a meaningful way in the drafting

of the IEP.  See Fuhrmann, 993 F.2d at 1036.  Moreover, the Hearing Officer, who heard

testimony from all witnesses and judged their credibility, rejected as fact that the IEP placement

was predetermined, and we find no non-testimonial, extrinsic evidence in the record that the

District predetermined L.M.'s placement or was not open to considering suggestions offered by

plaintiffs.  See D.S., 602 F.3d at 564.  As such, this claim is denied.

C.  Post-Secondary Goals and Transition Services

We next turn to plaintiffs' allegations that the IEP did not meet the standard of

appropriateness as a result of its failure to include appropriate measureable post-secondary goals

and transition services for L.M.  Plaintiffs argue the boilerplate transition plan in the IEP, which

consisted of information from an informal conversation with L.M. and one question on a parent input form, did not constitute an appropriate transition assessment such that the IEP team could have developed appropriate, measurable post-secondary goals related to training, education, employment, and, where appropriate, independent living skills.  Pls.' Brief 12/15/14 at 27. Moreover, plaintiffs argue several of the goals and expected levels of achievement included in the IEP were inappropriate, because, for instance, the expected level of achievement in math was "pulled out of the air," and the expected level of achievement in reading comprehension was lower than where L.M. was already performing.  Pls.' Brief 12/15/14 at 12.  Plaintiffs also argue the IEP should have contained goals in written expression, reading vocabulary, listening comprehension, communication skills, functional academics, and self-care.  See id. at 31-32.  In response, defendant states the Hearing Officer properly found the IEP was appropriate at the time it was developed.  Defendant argues the IEP included post-secondary transition services and goals aimed at preparing L.M. to attend college or for employment, and included reading goals, a math goal, and a self-advocacy goal.  Def.'s Brief 12/15/14 at 27.  Defendant states although baseline information for the IEP goals were not listed within the IEP, defendant planned to meet again to update the IEP, if needed, in the fall after school began and after the District had the opportunity to conduct some of its own curriculum-based assessments.  Id. at 30-31.  Defendant further argues it is wholly appropriate for a school district to plan additional assessments to determine baseline levels on annual goals after a child enters a program when the child is coming from a different educational placement in order to give the school district a period of time to get to know the child and have a reasonable rectification period of time to assess and potentially revise the IEP.  Id. at 31.

IDEA requires that every IEP created for a child aged sixteen (16) or older include appropriate, measurable post-secondary goals based on age appropriate transition assessments related to training, education, employment, and independent living skills, as well as corresponding transition services.  20 U.S.C. § 1414(d)(1)(A)(VIII).  A transition plan is a "set of activities" based on the student's needs and is created to help the disabled student move from school to post-school activities.  20 U.S.C. § 1401(34)(B); 34 C.F.R. § 300.43.  "The Third Circuit has not defined what amount of transition planning is required in an IEP to ensure FAPE.  However, the Third Circuit affirmed one district court's conclusion that a bare transition plan in a child's IEP did not deny the student FAPE."  High v. Exeter Twp. Sch. Dist., 2010 WL 363832, at 6 (E.D.Pa. Feb. 1, 2010) (citing Sinan L., 2007 WL 1933021, aff'd, 293 Fed.Appx. 912 (3d Cir. 2008)).  While a school district must provide opportunities for a disabled student to build independent living skills and explore a post-secondary educational or vocational plan, courts in the Third Circuit have emphasized that these requirements are undemanding and are focused more on exposure to opportunities than a promise of a particular outcome.  See, e.g., K.C. ex rel. Her Parents v. Nazareth Area Sch. Dist., 806 F. Supp. 2d 806, 822 (E.D. Pa. 2011).

Further, an IEP must contain "measurable annual goals" that relate to "meeting the child's needs . . . to enable [the child] to progress in the general curriculum."  20 U.S.C. § 1414(d)(1)(A).  The goals must also aim to meet "the child's other educational needs that result from the child's disability."  Id.  The term "other educational needs" is understood to encompass a child's needs outside the classroom, where warranted.  See Sinan L., 2007 WL 1933021, at 7 (citations omitted).

We find L.M.'s IEP offered proper transition services and goals as required for FAPE under IDEA as of the time it was offered.  First, with regard to transition services, L.M.'s

IEP proposed L.M. participate in a Freshman Orientation course throughout her ninth grade year designed to assist students with transitioning to the high school level including outlining textbooks, creating study guides/aides, and strategizing to improve time and task management. Docket No. 7, Administrative Record, Exhibit J-20.  The IEP proposed L.M. meet with the IEP team one time per period in all major classes to ease the post-secondary transition and discuss self-advocacy strategies, accesses help or support from the appropriate resource when needed, and manage grades and assignments with support.  Id.  The IEP further provided L.M. would meet with a guidance counselor to receive support with program planning to align with post-secondary education goals and noted L.M. would participate in an assessment to pinpoint potential areas of vocational interest.  Id.  The IEP stated L.M. "is unsure if she would like to attend post-secondary school," but L.M. "enjoys babysitting and has the goal of owning a babysitting business."  Id.  It noted L.M.'s mother "would like [L.M.] to attend college, if possible," but "[i]f not, [L.M.] will have a full time job working with children."  Id.  Moreover, the IEP provided L.M. with information about agencies that could further assist with her post-secondary transition.  Id.  As such, we find the IEP satisfied defendant's obligation under IDEA in this regard, because the transition plan was based on L.M.'s needs and was created to help L.M. move from private school to public school, and ultimately from school to post-school activities.  20 U.S.C. § 1401(34)(B); 34 C.F.R. § 300.43.

Second, with regard to measurable annual goals, the IEP listed the following four (4) goals: improving word reading skills, improving math application and problem solving, improving written expression (including the use of graphic organizers, word processing, and software), and a self-advocacy goal.  Id.  Although plaintiffs argue the math and reading comprehension goals were inappropriate, the math goal was based on a "to-be-determined

baseline number," and it recommended L.M. improve "at least 15 points" from said to-be-determined number.  N.T. 704, 712-715.  As such, plaintiffs' allegation that the math goal was "pulled out of the air" lacks context.  Id.  Second, the reading comprehension goal was intended to ensure L.M. continued to perform at the mastery level.  Indeed, with regard to reading comprehension, L.M. had performed at 100% accuracy in four (4) out of four (4) comprehension questions, but the IEP proposed that L.M. maintain a 90% reading comprehension accuracy rate.  Id.  The District considered both 90% and 100% to be mastery level, and, as such, the District's intent in creating a reading comprehension goal of 90% instead of 100% was that if and when L.M. progressed to the next comprehension level, she would continue to maintain mastery-level skills.  N.T. 704.

Moreover, although plaintiffs argue the IEP should have contained goals in written expression, reading vocabulary, listening comprehension, communication skills, functional academics, and self-care, a district does not need to provide "distinct measurable goals for each recognized need of a disabled student to provide a FAPE."  Coleman, 983 F. Supp. 2d at 572-73.  The court in Coleman noted "it would again be inconsistent with the longstanding interpretation of the IDEA to find that providing a FAPE requires designing specific monitoring goals for every single recognized need of a disabled student.  As noted above, a FAPE is a threshold guarantee of services that provide a meaningful educational benefit, not a perfect education."  Id.  While a lack of goals or progress monitoring for particular areas of need may render an IEP procedurally defective, plaintiffs have not provided evidence that any procedural defects rose to the level of substantial harm necessary to award the compensatory education or tuition reimbursement sought.  A dispute about the specific contents of an IEP is a substantive claim, and, therefore, is evaluated based on whether the IEP provided a meaningful educational

30

benefit.  See, e.g., D.S., 602 F.3d at 565.  Because plaintiffs have not shown that a lack of goals

in the above-referenced areas would have deprived L.M. of her ability to receive some

meaningful educational benefit, we find defendant did not deny L.M. a FAPE during this period,

and, as such, any procedural defects in the IEPs do not support awarding the relief sought by

plaintiffs.

### D.   Appropriateness of Proposed Classes

Plaintiffs next argue the classes proposed for L.M. were not conducive to her

learning, because they were generally too large and did not have sufficient opportunity for one-

on-one instruction or guided instruction.  Pls.' Brief 12/15/14 at 32.  Plaintiffs note the District

Psychologist testified L.M. needs a small class size for learning, and plaintiffs argue only one of

the District's proposed classes is an appropriate size – Algebra I(A) Curriculum Lab.  Id.  In

particular, plaintiffs argue the proposed Read 180® class is far too large and does not provide an

opportunity for one-on-one instruction or guided instruction (with the exception of small group

direct instruction).  Plaintiffs further state the Independent Examiner believed the District's

proposed classes were not appropriate for L.M.  Id.  In response, defendant argues plaintiffs'

claims were properly rejected by the Hearing Officer, because the IEP offered L.M. specially

designed instruction and/or accommodations in all areas of disability-based need with small

classes and low student-to-teacher ratios.  Def.'s Brief 12/15/14 at 28.

As referenced supra, parents are only entitled to tuition reimbursement when a

school district has failed to offer a FAPE.  To provide FAPE, school districts are required to

offer an IEP that is "reasonably calculated to enable the child to receive meaningful educational

benefits in light of the student's intellectual potential."  P.P. ex rel. Michael P. v. West Chester

Area Sch. Dist., 585 F.3d 727, 729-30 (3d Cir. 2009) (citation omitted).  School districts are not,

however, required to "maximize the potential" of each handicapped student.  T.R., 205 F.3d at

577 (citation omitted).

Here, in designing L.M.'s proposed class schedule, defendant offered

approximately nine (9) proposed courses for L.M.'s ninth grade year, which ranged in size from

five (5) students to thirty (30) students.  See HOD/FF at 44-45.  The largest proposed class, with

thirty (30) students, consisted of a regular education gym class, which was placed on L.M.'s

proposed schedule as a result of plaintiffs' request that L.M. participate in the regular education

gym class with accommodations.  Id. at 45; N.T. 755.  The remainder of the proposed classes

consisted of approximately fifteen (15) to twenty (20) students, with one (1) teacher and

typically one (1) support staff.  HOD/FF at 44.  Moreover, the Hearing Officer credited the

District's testimony that if the IEP team had met again, it would have considered additional

special education classes, such as a special education English class and a smaller special

education science class.  Id.  The District's proposed Read180® program was a ninety (90)

minute regular education program comprised of approximately fifteen (15) students broken down

into three (3) small groups of approximately five (5) students each.  Id. at 45.  The class was

designed for students in grades 3-12 whose reading achievements were below the proficient

level.  Students in the Read180® program receive "direct, explicit instruction," monitoring,

guidance, and necessary accommodations, among other things.  N.T. 813-875.  The teacher is a

Certified Reading Specialist who has completed Read 180 training.  HOD/FF at 45.  The Hearing

Officer found the District's testimony regarding the Read 180® program "established that the

District was offering an excellent reading program that has a good likelihood of being successful

in helping [L.M.] make meaningful progress in literacy." HOD/FF at 50.[3]  The Hearing Officer further noted, "I find the District's offer for 2011-2012 more than met the standard of appropriateness.  I do not find the District's program as articulated in the IEP is inappropriate." Id. at 55.

        Based on the submissions provided in this case, we disagree with plaintiffs' contentions that defendant's educational program was not reasonably calculated to provide L.M. with an educational benefit.  See, e.g., Munir v. Pottsville Area Sch. Dist., 723 F.3d 423, 434 (3d Cir. 2013) (holding smaller class size not necessary to ensure student received meaningful educational benefits when IEP satisfied IDEA, even if smaller classes may have contributed to student's ability to learn more easily).  The fact that L.M. might have been able to achieve greater results in a private program is not relevant to whether defendant afforded L.M. an opportunity for meaningful progress.  See Rowley, 458 U.S. at 192, 200.  While plaintiffs may not believe L.M.'s program was optimal, we are unconvinced defendant's proposed program was defective under IDEA.  As such, this FAPE claim is denied.

### E.   Size of District High School and L.M.'s Medical Conditions

        Plaintiffs next argue the size of the District high school and the number of students at the school were too much for L.M. and her medical conditions, because L.M. walks at a slower pace, prefers to avoid crowded hallways, experiences pain and discomfort, and has a weakened immune system.  See Pls.' Brief 12/15/14 at 25, 33.  Plaintiffs argue a smaller school, such as Woodlynde, is more appropriate.  Id.  Plaintiffs further argue the District failed to gather

---

[3] Plaintiffs also claim there is not sufficient data on the Read 180® program to report on the program's effectiveness in teaching children with specific learning disabilities, and as such, the program should not suffice.  We agree with the Hearing Officer's findings, however, that "the service with the greatest body of research" is not necessarily "required for a child to receive FAPE.  Likewise, there is nothing in the [IDEA regulations] to suggest that the failure of a public agency to provide services based on peer-reviewed research would automatically result in a denial of FAPE."  HOD/FF at 56 (quoting Ridley, 680 F.3d at 276) (citation omitted).  As such, this claim is denied.

sufficient information regarding L.M.'s medical conditions and necessary accommodations or to include said information in the IEP and the Hearing Officer incorrectly attributed the lack of information to Woodlynde and plaintiffs' failure to provide it.  Plaintiffs state the District Psychologist was aware of L.M.'s medical issues, and L.M.'s parents were open, responsive, and cooperative in light of the District's requests for information, and, as such, a lack of medical information in the IEP cannot be attributed to plaintiffs or Woodlynde.  Id. at 24-25.  Finally, plaintiffs argue the Hearing Officer referenced that L.M. rides a bike, swims, plays softball, babysits, and walks her dog, but ignored that L.M. rides a bike to keep her joints moving and plays softball to the extent that she is able, with accommodations, and L.M.'s desire to participate in activities should not constitute evidence that L.M. can traverse the District high school without accommodation.  Id. at 33.  In response, defendant states the distance L.M. would need to travel between classes at the District high school is not much different than the length L.M. traveled at Woodlynde, and L.M. successfully navigated the District high school during her visit.  Def.'s Brief 12/15/14 at 24.  Defendant notes L.M.'s illness is transient, and at the time the IEP was being created, L.M. had been symptom free, so there was no current medical need to plan for in the IEP.  Id. at 26.  Defendant further argues L.M. did not have any accommodations regarding her travel between classes at Woodlynde, and she had very minimal absences.  Id. Defendant argues if any issues regarding L.M.'s health or ability to traverse the school arose, the IEP team would have reconvened to discuss ways to accommodate the specific need.  Id.  As such, defendant argues the Hearing Officer properly rejected this claim.  Id.

The Hearing Officer noted, in relevant part:

> Although [L.M.'s] primary disability was OHI based on chronic static encephalopathy and other complex medical conditions, the District's IEP was devoted to the educational needs [L.M.] displayed, likely in large part to the

34

absence of information from the Parents or [Woodlynde] that [L.M.'s] medical condition significantly interfered with the learning process.  At the IEP meeting, in contrast to a large portion of their case at the hearing, the family did not emphasize [L.M.'s] physical disabilities even though the IEP meeting would have been the place to clearly articulate their concerns in this regard.

. . . .

Likewise, with regard to placement, although the Parent testified in detail to her and her child's having experienced frightening and critical medical issues when [L.M.] was in infancy, neither she nor the rheumatologist nor the [Woodlynde] representatives . . . who testified offered compelling evidence of such current severe physical impairment that the size of the [District] high school in comparison to [Woodlynde], and the greater distances at the [District] high school in comparison to [Woodlynde], should be a determining factor.  Although I carefully studied the pictures and pored over the floor plans, there simply was not enough evidence that a teenager who climbs stairs five times a day in school, who babysits toddlers, who rides a bike, who walks a dog, who goes to the mall, who swims on a team and who even occasionally plays softball is so impaired as to be restricted from attending the [District] high school.  Parents did not meet their burden of proof that the degree of [L.M.'s] current Health Impairment should be the determining factor even if the IEP is appropriate.

HOD/FF at 54, 56.

For the reasons that follow, we agree with the Hearing Officer and find plaintiffs have not shown by a preponderance of the evidence that L.M.'s IEP would not have provided her with a FAPE.  Although the District high school is larger than Woodlynde, plaintiffs have not shown that L.M.'s medical conditions would prevent her from walking to her classes at the District high school.  As the Hearing Officer correctly noted, L.M. climbs stairs at least five (5) timer per day, babysits toddlers, goes to the mall, rides a bike and swims (to ease the pain of her arthritis), walks a dog, and participates in softball.  See HOD/FF at 56.  At the IEP team meeting, while plaintiffs mentioned the District school was larger than Woodlynde and had more pupils, plaintiffs did not indicate they thought L.M. would be physically unable to traverse the school.  Moreover, on the date of her visit to the District, L.M. shadowed a student with a similar schedule as the District's proposed schedule for L.M., and L.M. was successfully able to

navigate to all of the classes.  When asked how her visit to the District high school was going, L.M. replied the day was going well and shared no physical complaints.  HOD/FF at 45-46.  Had L.M. began to present with issues traversing the school, the District noted the IEP team would have reconvened to work toward finding an accommodation that suited L.M.'s needs.  It was not until the Due Process Hearing that plaintiffs asserted, for the first time, that the District high school was too large for L.M. to traverse as a result of physical difficulties.  <u>Id.</u> at 54.

In addition, the District spoke to L.M.'s parents and Woodlynde and asked them to provide information regarding L.M.'s schedule, her medications, and her accommodations at the school.  <u>Id.</u> at 41.  The Hearing Officer noted L.M.'s conditions change at various times and therefore her medications change as well, with side effects from the medications being present at some times and not at others.  <u>Id.</u> at 39.  As of the summer of 2011 and during such time as the IEP was being created, L.M. had been arthritis-symptom-free for one (1) year, and L.M.'s physician had been weaning L.M. from her medications.  <u>Id.</u>  There was no evidence L.M. received accommodations traversing from one class to the next at Woodlynde, and plaintiffs did not emphasize L.M.'s physical disabilities at the IEP meeting such that the District would have had to make accommodations.  <u>Id.</u> at 54.  As such, we agree with the Hearing Officer's determination that there was not sufficient evidence in the record as of the creation of the IEP that L.M.'s medical condition "significantly interfered with the learning process."  <u>Id.</u>  As such, we find the District's IEP did not result in a denial of a FAPE, and plaintiffs have not pointed to sufficient extrinsic non-testimonial evidence to show by a preponderance of the evidence that L.M. was unable to traverse the District high school or was denied necessary accommodations.[4]

---

[4] Plaintiffs also argue L.M.'s IEP was inappropriate, because no one from Woodlynde was invited to the IEP team meeting.  We are aware of no case law, however, that required representatives from Woodlynde to be present at the

F. <u>Assistive Technology</u>

Plaintiffs also argue the District's IEP was inappropriate, because it did not indicate L.M. needed assistive technology.  Pls.' Brief 12/15/14 at 31.  Plaintiffs argue L.M. was using assistive technology at Woodlynde, yet in the IEP, the "Not Required" section was checked regarding whether L.M. needed assistive technology.  <u>Id.</u> at 10, 31.  Moreover, plaintiffs argue the District should have performed a formal evaluation to determine the level of assistive technology L.M. required.  <u>Id.</u> at 10.

The IDEA defines assistive technology devices as "any item, piece of equipment, or product system, whether acquired commercially off the shelf, modified, or customized, that is used to increase, maintain, or improve functional capabilities of a child with a disability."  20 U.S.C. § 1401(1)(A).  A school district is required to provide a student with assistive technology if "the child's IEP Team determines that the child needs access to those devices in order to receive FAPE."  34 C.F.R. § 300.105(b).  Therefore, although assistive technology will almost always be beneficial, a school is only required to provide it if the technology is necessary. Moreover, the failure to provide assistive technology denies a student FAPE only if the student could not obtain a meaningful educational benefit without such technology.  <u>See</u> <u>Melissa S. v. Sch. Dist. of Pittsburgh</u>, 183 F. App'x 184, 187 (3d Cir. 2006).

The Third Circuit has determined that a dispute about the specific contents of an IEP is a substantive claim.  <u>See, e.g.</u>, <u>D.S.</u>, 602 F.3d at 565.  Accordingly, it is evaluated based

---

IEP team meeting when information from Woodlynde had been provided to the District in advance of the IEP meeting.  Indeed, prior to the IEP team meeting, the District Psychologist spoke to two (2) Woodlynde nurses regarding L.M.'s ability to traverse the building and whether she needed accommodations moving to and from classes, reviewed accommodations and specially designed instruction provided to L.M. at Woodlynde, sought input from the teachers at Woodlynde including providing and reviewing teacher response forms, reviewed L.M.'s class schedule and attendance records for 2010-2011, and reviewed daily and quarterly progress reports from Woodlynde, among other things.  HOD/FF at 41, 42.  As such, Plaintiffs have not shown the District's failure to invite a representative from Woodlynde to the IEP meeting denied L.M. FAPE.

on whether the IEP provided a meaningful educational benefit.  Id.  Here, prior to the creation of

the IEP, the District performed numerous evaluations including, but not limited to, assessments

regarding L.M.'s reading abilities, cognitive abilities, and intelligence range to determine L.M.'s

needs and necessary learning accommodations.  HOD/FF at 42-43.  As such, and in accordance

with the results of the assessments, the IEP provided L.M. with access to assistive technology

devices in the form of books on tape, study guides and copies of class notes, graphic organizers,

structured writing guides, word processing, and software.  See Docket No., 7, Administrative

Record, Exhibit J-20.  The Hearing Officer credited the District's testimony that the reason the

"Not Required" box had been checked on L.M.'s IEP as to whether L.M. needed assistive

technology is because the District already provided most assistive technology on its computers,

which were available to all students.  N.T. 694.  The District testified that in creating an IEP, it

understood that items that were individualized and specialized should be included in the IEP as

opposed to services that are available to all regular education students, while also meeting the

needs of students such as L.M., as here.  N.T. 751.  The District noted that although Woodlynde

provided L.M. with additional assistive technology that the District was not familiar with, the

District is not required to offer an identical form of assistive technology as Woodlynde to

provide FAPE to L.M.  Indeed, even in the absence of a formal assistive technology evaluation,

the record reflects the District accounted for L.M.'s reliance on assistive technology devices

when crafting her IEP, as discussed supra.  As such, we find the assistive technology offered by

the District provided sufficient assistance such that L.M. could have obtained a meaningful

educational benefit at the District.

G.  Memory Deficits

Plaintiffs also argue the IEP is inappropriate, because it fails to address L.M.'s deficits in memory.  Plaintiffs argue that although L.M. scored within the average range on the WISC-IV for working memory, her academic achievement tests revealed deficits in working memory.  Pls.' Brief 12/15/14 at 9-10.  Plaintiffs note memory was incorrectly listed as a strength rather than a need in L.M.'s RR, and, as such, deficits in L.M.'s long term and short term memory were not addressed in her IEP.  Id. at 10.

While the lack of memory as an area of need in L.M.'s IEP may render the IEP procedurally defective, plaintiffs have not provided sufficient evidence that any procedural defects rose to the level of substantial harm necessary to award the tuition reimbursement sought. As referenced supra, because a dispute about the specific contents of an IEP is a substantive claim, it is evaluated based on whether the IEP provided a meaningful educational benefit.  See, e.g., D.S., 602 F.3d at 565.  Here, L.M.'s IEP provided for repeated directions and frequent comprehension checks.  Docket No. 7, Administrative Record, Exhibits J-20.  The IEP indicated L.M.'s teachers would ask L.M. to repeat directions to ensure comprehension.  Id.  The IEP noted L.M. would have access to review and repetition of new and previously taught  math skills and concepts.  Id.  Further, L.M. had access to extended time on all tests and quizzes with the option of a reader and an alternate location to reduce distractions.  Id.  Moreover, prior to creation of the IEP, defendant sought substantial information from Woodlynde teachers regarding L.M.'s performance in her classes, any assistive technology used, and any additional needs.  HOD/FF at 41-43.  Defendant incorporated this information into the creation of its IEP. Plaintiffs do not state how the District's failure to list memory as a need deprived L.M. of a meaningful educational benefit, and, as such, we find plaintiffs are not entitled to the reimbursement sought on this claim.

39

H.  Primary Disability Category

Plaintiffs argue L.M.'s RR improperly lists L.M.'s primary disability

classification as OHI due to chronic static encephalopathy and other complex medical needs and

the secondary disability category as SLD in the areas of basic reading skills, reading

comprehension, reading fluency, math problem solving, and listening comprehension.  See Pls.'

Brief 12/15/14 at 11.  In response, defendants argue the Hearing Officer properly determined the

RR was appropriate.  Def.'s Brief 12/15/14 at 28.  Further, defendants argue the preponderance

of the evidence supports the RR's identification of SLD as a secondary disability category.  Id. at

38.

Here, the Hearing Officer, who pored through the administrative record and heard

testimony of eleven (11) witnesses during a hearing that extended four (4) days, found L.M.'s

RR and subsequent IEP to be appropriate.  With regard to plaintiffs' allegations that SLD should

have been L.M.'s primary disability category, the Hearing Officer stated:

> The [independent evaluator] who performed the IEE went well beyond the bounds
> of her data sets she had available to her from the two psychologists whose reports
> predated hers (District Psychologist and [CHOP] Psychologist) in trying to
> establish that [L.M.] had a specific learning disability in written expression and
> therefore that the IEP was inadequate for not addressing this area in a goal.
> Additionally, her efforts to establish that SLD and not OHI was [L.M.'s] primary
> disability did not help the Parents' case and obscured the issues.

HOD/FF at 50.

While plaintiffs argue the RR improperly lists OHI, rather than SLD, as the

primary disability category, they fail to indicate how L.M.'s educational program would have

differed had the secondary category been identified as the primary category.  Moreover,

Plaintiffs do not point to any case law holding the failure to order disability categories in a

certain way gives rise to a violation of IDEA.  To prove an IDEA violation creating a right to

40

relief, as here, plaintiffs must show the IEP failed to provide L.M. an opportunity to make meaningful progress in her education.  Because plaintiffs have failed to show how the ordering of the primary disability category and the secondary disability category in the IEP, and the subsequent services defendant provided to L.M., denied L.M. the opportunity to make meaningful progress, this FAPE claim fails.  As such, we find plaintiffs have not met their burden to show the IEP was not reasonably calculated to enable L.M. to receive educational benefits.  Rowley, 458 U.S. at 206-07.

### ii.  Whether Placement at Private School was Proper

The second prong of the Burlington-Carter tuition reimbursement analysis requires a Hearing Officer to determine whether the private school for which tuition reimbursement is sought, is appropriate.  Burlington Sch. Committee, 471 U.S. 359.  Here, the parties have stipulated Woodlynde is appropriate for L.M.  As such, we need not evaluate this prong.

### iii.  Equitable Considerations

With regard to the third prong of the Burlington-Carter test, although we hold L.M. was not denied a FAPE and therefore cannot seek tuition reimbursement for her private education, we agree with the Hearing Officer that, alternatively, the equitable considerations weigh against granting the relief sought by plaintiffs.  Even where a District is found to be in violation of IDEA and private school placement is deemed appropriate, "courts retain discretion to reduce the amount of a reimbursement award if the equities so warrant."  Forest Grove Sch. Dist. v. T.A., 557 U.S. 230, 247 (2009).  IDEA directs that an award of private school tuition "may be reduced or denied" under a variety of circumstances, including "upon a judicial finding of unreasonableness with respect to actions taken by the parents," or where the parents did not

41

inform the IEP team at the most recent IEP team meeting the parents attended prior to removal of the child from the public school "that they were rejecting the placement proposed by the public agency to provide FAPE to their child, including stating their concerns and their intent to enroll their child in a private school at public expense." 20 U.S.C. § 1412(a)(10)(C)(iii)(III); 34 C.F.R. § 300.148. "IDEA was not intended to fund private school tuition for the children of parents who have not first given the public school a good faith opportunity to meet its obligations." C.H., 606 F.3d at 71.

> As referenced supra, the Hearing Officer noted, in relevant part:
>
> [A]lthough the concept of "predetermination" applies only to Districts and is not a two-way street, I do find that the Parents behaved inequitably albeit in a manner that they believed with conviction was protecting their child's best interest. I find that the Parents' request for a Due Process Hearing just days after their receipt of the reevaluation report, before an IEP was created and a NOREP offered, was unreasonable. Although the Parents ultimately participated in an IEP meeting, and [L.M.] visited the high school, I find no credible evidence that the family seriously entertained the prospect of accepting the District's proposed program and placement. Special Education Appeals Opinions offer reflections that are consistent with my thoughts in this regard: "When [t]he parents have become so singularly focused on the [private school in which they have already enrolled their child] that they appear unwilling to consider the District's proposals in good faith," tuition reimbursement should be denied . . . Similarly, "Where the parents have predetermined that they will place their child in a private school regardless of the district's ability to program for the child, the equities favor the District."

HOD/FF at 54 (citations omitted).

> We agree with the Hearing Officer's findings that there is no evidence in the record that plaintiffs seriously entertained accepting defendant's proposed program and placement. Although plaintiffs note they were responsive to requests for information from the District, just three (3) days after L.M.'s mother received the District's RR, prior to discussion of an IEP team meeting and before learning of any program placement, L.M.'s mother emailed the District requesting a Due Process Hearing. HOD/FF at 43-44. Moreover, at the IEP team

meeting, plaintiffs did not inform the IEP team of their concerns about the IEP, as required under 34 C.F.R. § 300.148. The Hearing Officer noted "[a]t the IEP meeting, neither [L.M. nor [L.M.'s] mother raised a concern regarding [L.M.'s] having to walk too far at the [District] high school or any other concern regarding [L.M.'s] physical condition, except in the context of whether [L.M.] would take one or the other gym class. HOD/FF at 45. The Hearing Officer noted it was not until the Due Process Hearings that plaintiffs raised concerns regarding the IEP's failure to address memory issues, L.M.'s transition from public school to private school, or the measurability of a goal. HOD/FF at 54. Similarly, at the IEP team meeting, plaintiffs did not indicate they were rejecting the placement proposed by the District, nor did they relay their intent to enroll the Student at Woodlynde at public expense. Although plaintiffs emailed the District on May 13, 2011 advising the District that plaintiffs liked Woodlynde, felt L.M. was making progress at Woodlynde, and wanted to keep L.M. at Woodlynde, plaintiffs did not address any additional concerns with the IEP, such that the District could work with plaintiffs to correct said concerns. Id. at 46. As such, plaintiffs' communications fell short of providing the District with notice of concerns regarding the District's IEP. See 20 U.S.C. § 1412(a)(10)(C)(iii)(III); 34 C.F.R. § 300.148. Based on these circumstances, equitable relief is not warranted.

b. Appropriateness of the Reevaluation

Plaintiffs additionally argue the District's RR was inappropriate, because it failed to assess (i) L.M.'s needs related to her complex medical conditions' effect on her daily functioning or educational performance, (ii) L.M.'s memory, which was incorrectly reported as a strength in the RR, even though L.M. has needs in all areas of memory, (iii) whether L.M. required assistive technology, which L.M. utilized on a day to day basis at Woodlynde, and (iv) transition planning through appropriate transition assessments. Plaintiffs argue as a result of the

43

District's inappropriate RR, the IEP team could not develop appropriate measurable postsecondary goals, transition services to assist L.M. in reaching said goals, or independent living skills where appropriate.  See id. at 23-27.  In response, defendant argues the appropriateness of the RR is not part of the three-pronged tuition reimbursement test.  See Def.'s Resp. 1/30/15 at 3.  Defendant argues the only relevant inquiry for a tuition reimbursement claim regarding the documents generated by the District is whether the IEP offered by the District was appropriate, not whether the RR was appropriate.  Id.  Moreover, defendant asserts the Hearing Officer correctly determined the District's RR was appropriate.  Id.

Whether the District's reevaluation was flawed is a procedural question under IDEA.  See, e.g., Kathryn F. v. W. Chester Area Sch. Dist., 2013 WL 6667773, at 8 (E.D. Pa. Dec. 18, 2013).  As referenced supra, a school district's failure to comply with a procedural requirement of IDEA constitutes a denial of a FAPE only if the violation causes substantive harm to the child or his parents.  See C.H., 606 F.3d at 66-67.  Substantive harm occurs only when the preponderance of the evidence indicates a procedural inadequacy: (i) impeded the child's right to a FAPE; (ii) significantly impeded the parent's opportunity to participate in the decision-making process regarding the provision of a FAPE to the parent's child; or (iii) caused a deprivation of educational benefit.  See 34 C.F.R. § 300.513(a)(2).

As discussed in detail supra, this court has analyzed plaintiffs' arguments regarding the RR as they pertained to the creation of the IEP and has found (i) the District provided L.M. with FAPE, (ii) plaintiffs were provided with the opportunity to participate in the decision-making process regarding the provision of FAPE, and (iii) L.M. was not deprived of educational benefit.  In creating its RR, defendant reviewed L.M.'s existing data, conducted

44

numerous assessments, and otherwise complied with the regulations under IDEA.[5]  HOD/FF at

41-42.  As such, we find the District's reevaluation was appropriate.[6]

      c.  <u>Whether the Hearing Officer Erred in Denying Plaintiffs' Reimbursement for the</u>
<u>Independent Educational Evaluation</u>

        Plaintiffs challenge the July 3, 2012 decision of the Hearing Officer finding L.M.

was not entitled to an IEE paid for by the District, arguing the evidence supports a finding that

plaintiffs obtained the IEE due to concerns with the RR.  Pls.' Brief 12/15/14 at 36-37.  In

response, defendant argues the Hearing Officer properly found plaintiffs were not entitled to

reimbursement for the report, because (i) plaintiffs never expressed disagreement with the RR,

and (ii) plaintiffs IEE is really an improper request for reimbursement for their expert costs

associated with this litigation.  Def.'s Brief 12/15/14 at 36.

        An IEE is "an evaluation conducted by a qualified examiner who is not employed

by the public agency responsible for the education of the child in question."  34 C.F.R. §

300.502(a)(3)(i).  If a parent disagrees with the reevaluation by the public agency, the parent has

a right to an IEE, and unless the public agency files a due process complaint and establishes its

evaluation was appropriate, the public agency must pay for the IEE.  <u>Id.</u> at § 300.502(b).  The

Third Circuit Court of Appeals has applied the regulation broadly to permit reimbursement not

---

[5] In conducting a reevaluation, IDEA regulations state a school district must (i) use a variety of assessment tools, (ii) gather relevant functional, developmental, and academic information about the child, including information from the parent, (iii) use technically sound instruments to determine factors such as cognitive, behavioral, physical, and developmental factors that contribute to the disability determination, and (iv) refrain from using any single measure or assessment as the sole criterion for a determination of disability or an appropriate program.  34 C.F.R. § 300.304(b)(1-3).  A reevaluation must be administered by trained personnel under standard procedures in all areas of suspected disability.  20 U.S.C. § 1414(b)(3).  In addition, a reevaluation must review existing data, current classroom-based or state assessments, classroom observations, teacher observations, and related service provider operations.  <u>Id.</u> at § 1414(c).

[6] Plaintiffs additionally argue the IEP was based on one (1) page of the RR – which was inappropriate – and, as such, it follows the IEP is inappropriate.  For the reasons discussed in this opinion, we have found the IEP provided L.M. with FAPE, and, as such, this claim is denied.

only when plaintiffs expressly disagree with an evaluation but also when "the parents[ ] fail[ ] to express disagreement with the District's evaluations prior to obtaining their own" evaluation, because unless the regulation is so applied "the regulation [would be] pointless because the object of parents' obtaining their own evaluation is to determine whether grounds exist to challenge the District's." Warren G. ex rel. Tom G. v. Cumberland Cnty. Sch. Dist., 190 F.3d 80, 87 (3d Cir. 1999). Consequently, the Third Circuit has held reimbursement may be warranted where a parent does not take a position with respect to the district's evaluation or otherwise "fails to express disagreement." Lauren W. ex rel. Jean W. v. DeFlaminis, 480 F.3d 259, 274-75 (3d Cir. 2007). If it is determined an "agency's evaluation is appropriate," through a due process complaint, however, as here, a parent "still has the right to an IEE, but not at public expense." 34 C.F.R. § 300.502(b)(3).

   In addition, IDEA provides an IEP will be developed through cooperation and collaboration between teachers, special education professionals, and parents. See Sch. Comm. of Town of Burlington, Mass. v. Dep't of Educ. of Mass., 471 U.S. 359, 368 (1985). Similarly, the governing regulation contemplates that parents are entitled to reimbursement for independent evaluations when they are collaborating with the local educational agency in developing an appropriate IEP, based on the district's own evaluations and any independent evaluations. When a parent disagrees with a district's evaluation, the parent will first request an independent evaluation from the district, who is then responsible for ensuring an evaluation is provided at public expense. 34 C.F.R. § 300.503(b)(2)(ii).

   In reviewing plaintiffs' request for reimbursement for the IEE plaintiffs obtained at their own expense, the Hearing Officer stated:

> The requested reimbursement for the independent educational evaluation must be denied as the District produced a very complete and thorough reevaluation of [L.M.] in all areas of suspected exceptionality, and each segment of its evaluation met every criteria set forth by the IDEA as quoted above.

HOD/FF at 56.

Here, we conclude plaintiffs are not entitled to reimbursement, because plaintiffs unilaterally sought an independent evaluation outside the collaborative IEP process and only sought reimbursement after unilaterally contacting an independent evaluator. Indeed, the evaluation was requested and performed after L.M.'s enrollment in Woodlynde for the 2011-2012 school year. HOD/FF at 46-47. The record demonstrates the evaluation was not obtained by plaintiffs in consultation with the District or with the intention L.M. would consider defendant's proposed placement. Rather, the record indicates the evaluation was sought for the purpose of providing additional evidence that defendant's proposed services were inadequate, thereby supporting plaintiffs' contention that private placement at public expense was necessary. See, e.g., M.S. v. Mullica Twp. Bd. of Educ., 485 F. Supp. 2d 555, 575 (D.N.J. 2007) aff'd, 263 F. App'x 264 (3d Cir. 2008) (noting parents not entitled to reimbursement where IEE was unilaterally obtained and parents had no intent of entertaining proposed placement). As such, we hold plaintiffs are not entitled to reimbursement for the independent evaluation.[7]

d.  Claims Under Section 504 of the Rehabilitation Act

Plaintiffs argue the District violated Section 504 of the Rehabilitation Act by denying L.M. a FAPE. The District asserts Plaintiffs failed to provide any evidence of discrimination against L.M. so as to create liability under Section 504.

---

[7] Defendant's alternative argument that plaintiffs are not entitled to reimbursement, because plaintiffs did not express disagreement with the District's RR is rejected. The Third Circuit has held a parent's failure to express disagreement with a District's evaluation prior to obtaining their own does not foreclose a parent's right to reimbursement. See Warren G. ex rel. Tom G., 190 F.3d at 87.

IDEA and Section 504 are similar causes of action. While IDEA imposes an affirmative duty on public schools that accept certain federal funds, Section 504 is a prohibition against disability discrimination in federally funded programs.  See 29 U.S.C. § 794(a) ("No otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.").  A FAPE violation is not a per se violation of Section 504; a plaintiff must still prove all elements of a Section 504 case. Andrew M. v. Del. County Office of Mental Health and Mental Retardation, 490 F.3d 337, 350 (3d Cir. 2007).  When a district court finds a child was provided with appropriate IDEA services, however, the court need not reach the Section 504 claim. See Christen G. v. Lower Merion Sch. Dist., 919 F.Supp. 793, 821 (E.D.Pa. 1996).

In reviewing plaintiffs' claims, the Hearing Officer stated:

> The parents suggested that they are asserting a claim that the District violated § 504 of the Rehabilitation Act . . . Parents, however, adduced no explicit evidence of discrimination on the basis of disability, and did not argue that the evidence established a separate and distinct claim under § 504 in addition to the District's alleged denial of FAPE.  When parents assert identical claims under IDEA and Section 504, the findings in favor of a district or the remedies assessed against a district are satisfied under the IDEA . . . To the extent that Parents intended to pursue a § 504 claim, it is deemed abandoned or waived based upon lack of evidence/argument.

HOD/FF at 57.

Here, because L.M. was provided with FAPE under the IDEA, and because plaintiffs have provided no evidence of L.M. being subjected to discrimination, plaintiffs have provided no basis on which this court could find a Section 504 violation.  As such, we will dismiss plaintiffs' Section 504 claim.  See, e.g., Laborers' Int'l Union v. Foster Wheeler Corp., 26 F.3d 375, 398 (3d Cir. 1994) ("An issue is waived unless a party raises it in its opening brief, and

for those purposes a passing reference to an issue . . . will not suffice to bring that issue before this court.") (internal quotation marks omitted).

e.  Claims Under the Americans With Disabilities Act

Plaintiffs request relief under the ADA; however, plaintiffs have failed to develop an argument in support of this claim.  Failure to develop said argument is a sufficient ground for deeming such claims waived.  See Laborers' Int'l Union v. Foster Wheeler Corp., 26 F.3d 375, 398 (3d Cir. 1994) ("An issue is waived unless a party raises it in its opening brief, and for those purposes a passing reference to an issue . . . will not suffice to bring that issue before this court") (internal quotation marks omitted).  As such, plaintiffs' ADA claim is dismissed.

f.  Compensatory Damages

The Third Circuit has held plaintiffs are required to prove intentional discrimination in seeking compensatory damages under the ADA.  Chambers v. Sch. Dist. of Philadelphia Bd. of Educ., 537 F. App'x 90, 96 (3d Cir. 2013).  Here, plaintiffs have failed to allege or show intentional discrimination and have failed to develop an argument in support of said claim.  See Foster Wheeler Corp., 26 F.3d at 398.  As such, we decline to award compensatory damages.

g.  Attorneys' Fees and Costs

A court may award attorney's fees to a "prevailing party" who brought suit under IDEA.  20 U.S.C. § 1415(i)(3)(B)(i)(I). Because plaintiffs did not "prevail" in this challenge, we decline to award attorney's fees.  See, e.g., Hannah L. v. Downingtown Area Sch. Dist., 2014 WL 3709980, at 8 (E.D. Pa. July 25, 2014).

IV.    CONCLUSION

For the foregoing reasons, we find the education offered by the District to L.M. for the 2011-2012 school year was reasonably calculated to provide L.M. with a meaningful educational benefit.  Moreover, we find plaintiffs are not entitled to reimbursement for their independent evaluation or to attorney's costs or fees.  Finally, plaintiffs remaining claims are denied or waived for the reasons discussed above.  As such, we grant defendant's motion for judgment on the administrative record and summary judgment (Document No. 12) and deny plaintiffs' motion (Document No. 11).

An appropriate order follows.


BY THE COURT:


 /s/ LINDA K. CARACAPPA
LINDA K. CARACAPPA
UNITED STATES MAGISTRATE JUDGE



[Additional Note:  The court wishes to recognize the significant contribution of Brittany J. Gigliotti, Esquire in the research and drafting of this memorandum opinion.]